UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT COLIN LEWENSTEIN, FRANCESCA MANUELA DAVIS, AND ELSA HANNCHEN GUIDOTTI,<br><br>Plaintiffs,<br><br>- against -<br><br>BAYERISCHE LANDESBANK,<br><br>Defendant. | ECF Case<br><br>Case No.<br><br>**COMPLAINT** |

Plaintiffs Robert Colin Lewenstein, Francesca Manuela Davis and Elsa Hannchen Guidotti (together "Plaintiffs"), by their attorneys Krauss PLLC, as and for their Complaint against Bayerische Landesbank ("BLB" or "Defendant"), allege as follows:

## Nature of the Action

1. In this action, Plaintiffs seek restitution of a renowned work of art by Wassily Kandinsky, entitled *Das Bunte Leben,* signed 1907 (the "Painting"), which was confiscated from their family as a result of the Nazis' campaign of genocide during the Nazis' occupation of the Netherlands in 1940. The Painting is now on display in a prominent Munich museum, the Städtische Galerie im Lenbachhaus und Kunstbau (the "Lenbachhaus"), "on permanent loan" from BLB who claims to be the "owner." BLB and the Lenbachhaus, for their individual and mutual benefit, have commercially exploited the Painting in New York and elsewhere. Plaintiffs have provided evidence of their rights to the Painting to BLB and made a demand upon BLB to return to them their valuable family heritage. BLB has refused to do so.

## Parties

2. Plaintiff Robert Colin Lewenstein ("RCL") is an individual, an American citizen, and a resident of the State of Ohio. He is one of the two living heirs of Hedwig Lewenstein-Weyermann ("Hedwig") and her children, Robert Gotschalk Lewenstein ("RGL") and Wilhelmine Helena Lewenstein ("Wilhelmine"), who owned the Painting prior to its despoilment.

3. Plaintiff Francesca Manuela Davis ("Francesca") is an individual, an American citizen and a resident of the State of Texas. She is one of the two living heirs of Hedwig and her children, RGL and Wilhelmine, who owned the Painting prior to its despoilment.

4. Plaintiff Elsa Hannchen Guidotti ("Elsa") is an individual, a Dutch citizen, and a resident of the Netherlands. She is the only heir of Irma Klein ("Irma"), RGL's first wife prior to the despoilment, whose financial interest in the Painting was derived through then existing community property laws.

5. RCL, Francesca and Elsa comprise the entire community of heirs to the Painting.

6. Upon information and belief, Defendant BLB is a public German bank, established under public law of the Free State of Bavaria. BLB is 75% owned by the Free State of Bavaria and 25% owned by the Association of Bavarian Saving Banks, also a public entity. The Bavarian Saving Banks are owned by public territorial authorities such as Bavarian cities or districts and act not only as local banks for private clients, but also as house banks for their public owners. BLB owns and operates a subsidiary branch in New York ("BLBNY"), located at 560 Lexington Avenue, New York, NY 10022.

**Jurisdiction and Venue**

7. This Court has subject matter and personal jurisdiction over BLB in this non-jury civil action under 28 U.S.C. §1330(a) and 28 U.S.C. §§1605-07, the Foreign Sovereign Immunities Act. In accordance with 28 U.S.C. § 1330(b), service will be made under 28 U.S.C. §1608.

8. BLB is an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. §1603(b) because (i) it is a separate legal entity, (ii) its shares are owned 75% by the Free State of Bavaria and 25% owned indirectly through a public entity comprised of public territorial authorities such as Bavarian cities or districts which are political subdivisions of the Free State of Bavaria and the foreign state of Germany within the meaning of the statute, and (iii) it is not a citizen of any State of the United States as defined in 28 U.S.C. §1332(c) and (e), and it was not created under the laws of any third country other than the United States or Germany.

9. Rights in property taken in violation of international law are in issue in this action within the meaning of 28 U.S.C. §1605(a)(3). Specifically, the property in issue is the Painting, which BLB claims to own and Plaintiffs contend belongs to them and was taken from their family in violation of international law, first during the Nazi occupation of the Netherlands in the 1940s, then by BLB in 1972, and then again by BLB in 2016.

10. BLB is engaged in commercial activity in the United States, and in this judicial district, within the meaning of 28 U.S.C. §1605(a)(3).

a. BLB owns and operates BLBNY in Manhattan, which it has acknowledged is "key to the German customer business."

b. BLB has been operating in New York for over 30 years and has approximately 90 employees in its BLBNY office acting as relationship managers. BLBNY's

full banking license in the US affords BLB access to the dollar liquidity program operated by the Federal Reserve Bank, which ensures USD funding for all of BLB.

c. BLBNY is focused on serving United States, New York and other corporate customers with a connection to Germany and serving the needs of German customers in the United States.

d. BLB and BLBNY's business interests also extend to the art market, and both have established and developed a substantial art collection. BLB and BLBNY, as part of their business strategy, have collected, organized and held exhibitions of art. BLB has further acknowledged that one of the purposes of its acquisitions and permanent loans are to provide support for museums and cultural institutions in both Munich and other parts of Bavaria.

11. BLB has also engaged in commercial activity in the United States, and in this judicial district, within the meaning of 28 U.S.C. §1605(a)(3) with respect to the Painting.

a. From the time of its purchase of the Painting in 1972 to the present, the Painting has been "on permanent loan" to the Lenbachhaus in Munich, which is generally considered to be one of the three most important Kandinsky institutes in the world. The Lenbachhaus, which is wholly owned by the City of Munich, has promoted and commercially exploited the Painting in furtherance of its cultural mission through, among other things, its exhibition and loans, which serve to draw visitors, including from the United States and New York, to the museum, to associate the name of BLB with support for and as a patron of the arts, and to generate income for the museum and business for BLB.

b. The Painting has been commercially exploited in New York. From September 18, 2009 to January 13, 2010, the Painting, which rarely traveled, was loaned to the Kandinsky exhibition at the Guggenheim Museum (the "Guggenheim") in New York. The

Painting was promoted as one of the highlights of the exhibition, depicted in a double page spread in the catalogue of the exhibition, and a photograph of the Painting was made available as part of the press-kit for the exhibition. The photograph of the Painting was published by numerous newspapers, websites and magazines in articles about the exhibition, which identified it as "owned" by BLB, "on permanent loan" to the Lenbachhaus. The Painting therefore served as a way to promote both BLB and the Lenbachhaus and to garner goodwill and positive publicity. Moreover, such high exposure in an exhibition in a museum as prestigious as the Guggenheim served to dramatically increase the value of the Painting.

c. The Lenbachhaus, acting on behalf of itself and BLB, was greatly involved in the commercial activities associated with the Guggenheim exhibition. Upon information and belief, this included co-organizing the exhibition, transporting the Painting to New York, installing it at the Guggenheim, furnishing the photograph of the Painting to be used in the promotional materials, hiring a New York researcher to work on the catalogue, selling the catalogue for the exhibition and other Lenbachhaus publications including the Painting through New York channels and shops, selling products and posters of the Painting to United States residents, collaborating in a documentary about Kandinsky made in conjunction with the exhibition which included footage of the Painting at the Lenbachhaus which was aired in New York and cities all over the world, and organizing a tour for the Förderverein (Society of the Friends of the Lenbachhaus) to New York in 2009 to see the Kandinsky exhibition at the Guggenheim.

d. Through the loan of the Painting to the Guggenheim in New York and its exhibition in New York, BLB was able to generate funds in New York that were used in the support of the Lenbachhaus and its cultural mission, in accordance with its corporate objectives.

According to statements made by BLB in its recent annual reports, these include: the promotion of art and culture in Munich and Bavaria in general, buying art for BLB's collection, supporting Munich's galleries and various other Bavarian establishments by donating valuable items on permanent loan, giving contemporary artists the opportunity to exhibit their work in the Gallery BLB maintained in Munich, organizing exhibitions at other venues, publishing exhibition catalogues, participating with BLB's Gallery in presenting Munich's "Evening of Museums and Galleries," and providing the Bavarian state collections with the opportunity to use Palais Dürckheim, one of BLB's corporate buildings in Munich, to organize lectures, workshops and seminars on arts and culture.

12. Venue is proper in this District under 28 U.S.C. §1391(f)(3) because BLB conducts business in this District through BLBNY.

## **Factual Allegations**

*Ownership of the Painting*

13. Prior to World War II, Emanuel Albert Lewenstein ("Emanuel") and his wife Hedwig were Jewish residents in the Netherlands. Emanuel owned and was a director of the sewing machine business his father Adolph Lewenstein had founded, A. Lewenstein Naaimachines (later known as N.V. Amsterdamsche Naaimachinenhandel), a midsize company which did business both domestically and internationally.

14. During their lives, Emanuel and Hedwig acquired a substantial collection of art, "the Lewenstein Collection," including many paintings, drawings and prints from old masters and modern artists. Most significant among them were the Painting, another Kandinsky painting, old master paintings by Aert van der Neer, Adriaan van de Velde and Philip Wouwerman, several Rembrandt prints, and a modern painting by Jean Metzinger.

15. Emanuel and Hedwig were well-known and well-respected within the Amsterdam art community, as collectors and as patrons of the arts, as well as through their loans or donations of works from their well-regarded collection.

16. Hedwig was the owner of the Painting, and was so identified by Kandinsky himself in his handwritten "Hauskatalog," an inventory made by Kandinsky of his own artworks, including notes about years of creation, titles and provenance.

17. In 1933, Hedwig loaned the Painting for an exhibition in Groningen and is listed in that catalogue as its owner. That same year, she loaned the Painting to the Stedelijk Museum (the "Stedelijk") in Amsterdam.

18. The Stedelijk was and is a municipal entity, owned and operated by the City of Amsterdam at all times up through 2006, when it became a foundation. Its collections consist of modern and contemporary art and design, which it began collecting in the 1930s. Kandinsky is one of the artists featured by the Stedelijk.

19. Hedwig died in 1937 and in her last will and testament left the Lewenstein Collection, including the Painting, to her two surviving children, RGL and Wilhelmine.

20. In 1933, RGL married Irma, a German-Jewish actress. He remained in the Netherlands until April 1939, working at the sewing machine company, when he resigned as a director due to health concerns. In that year, he also separated from Irma and went to the south of France. They formally divorced in 1944. There were no children of the marriage.

21. In 1938, Wilhelmine left the Netherlands to go to Mozambique, which was then a part of Portugal.

22. The books of the Stedelijk reflect that on December 8, 1938, the director of the museum confirmed that the Stedelijk had taken custody of the Painting on behalf of the Lewenstein family.

*The Nazi Occupation of the Netherlands and the Seizure of the Painting*

23. On May 10, 1940, German forces illegally invaded the Netherlands and began their occupation of the country for the remainder of the war.

24. Prior to the invasion, Dutch Jews had received harrowing reports from the Dutch press and German-Jewish refugees (including Irma) regarding the situation of Jews in Germany, Austria, Czechoslovakia and Poland. Dutch Jews were well aware that as soon as the Germans invaded, they would face immediate discrimination, followed by loss of their civil rights, confiscation of their possessions, imprisonment and possibly death.

25. Recognizing this, Wilhelmine and RGL knew they would be risking their lives if they returned to the Netherlands. In addition, Wilhelmine and RGL were cut off from accessing any of their funds in the Netherlands. Thus, they were powerless to retrieve or protect any of their property, including the Painting and the rest of the Lewenstein Collection, which remained in the Netherlands.

26. The danger was so great that when the Germans also began occupying France shortly after entering the Netherlands, RGL feared for his safety in Europe altogether. He fled from France to Portugal with a woman he was staying with in France, American-born Shirley Goodman, and from there, they sailed to New York, arriving on July 18, 1940. He remained in the United States for the rest of the war. Wilhelmine remained in Mozambique and, later Portugal.

27. It is well-established that a key focus of the Nazis upon their invasion of a country was the looting of artwork. "The Nazis stole hundreds of thousands of artworks from museums and private collections throughout Europe, in what has been termed the 'greatest displacement of art in human history.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 957 (9th Cir. 2010). Such seizures were in furtherance of the Nazis' campaign of genocide in Europe. *Simon v. Republic of Hungary,* 812 F.3d 127, 142–43 (D.C. Cir. 2016). Thus, "property seizures from Jews during the Holocaust constitute genocidal takings which violate international law." *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 163 (D.D.C. 2016); *Simon v. Republic of Hungary*, 812 F.3d 127, 142–43 (D.C. Cir. 2016)["[W]e see the expropriations *as themselves genocide"* and constitute "takings" "in violation of international law"]; *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1203 (C.D. Cal. 2001), *aff'd and remanded,* 317 F.3d 954 (9th Cir. 2002), *opinion amended on denial of reh'g,* 327 F.3d 1246 (9th Cir. 2003), and *aff'd on other grounds,* 541 U.S. 677, 124 S. Ct. 2240, 159 L. Ed. 2d 1 (2004)["[T]he 'aryanization' of … art collection[s] by the Nazis is undeniably a taking in violation of international law....Moreover, the Nazi's aryanization of art collections was part of a larger scheme of the genocide of Europe's Jewish population"]. The United States Congress similarly declared in the Holocaust Victims Redress Act, Public Law 105–158 (Public Law 105-158, 112 Stat. 15 (1998): "The Nazis' policy of looting art was a critical element and incentive in their campaign of genocide against individuals of Jewish and other religious and cultural heritage…Hence, the same international legal principles applied among states should be applied to art and other assets stolen from victims of the Holocaust."

28. The Nazis, by themselves and through their agents and collaborators, despoiled art owned by Jews through theft, confiscation, forced sales, looting, aryanization, fear and coercion, all of which are takings in violations of international law.

29. The Nazis began their looting of property in the Netherlands shortly after the invasion. In June 1940, the Nazis declared that any assets in the Netherlands belonging to enemies of Germany were to be confiscated. The forced sales of Jewish art and property were underway immediately. At or about the time of the invasion, a Nazi art looting agency (the Dienststelle Mühlmann) was established in the Netherlands and was actively searching for art and art collections to sell to Hermann Göring ("Göring") and Adolf Hitler and forcing their sale under duress or by outright confiscating them. In as early as June 1940, Alois Miedl ("Miedl"), a German banker, art dealer and close friend of Göring, was one of those actively buying and selling art for and to Nazi officials. He was well acquainted with the wealthy Jewish families in Amsterdam and preyed upon them to acquire their art.

30. Most notable among Miedl's exploits at that time was the forced sale of the famed Goudstikker art dealership, owned by prominent Jews, and its collections.

31. The auction house of Frederik Muller & Co. ("Muller"), the most important auction house in the Netherlands at that time, is known to have been one which collaborated with the Nazis and organized auctions of art and possessions looted from Jews, similar to the "Judenauktionen" in Germany and Austria. Muller prepared elaborate catalogues for his auctions which required time for photographs, preparation and printing.

32. In early August 1940, Miedl arranged for artworks from the Goudstikker Collection to be transported to the Muller auction house in preparation for their sale at an auction scheduled for October 1940.

33. At or about the same time, arrangements were also made to sell the Lewenstein Collection, another key collection owned by Jews, at the same October 1940 Muller auction. Arrangements had to be made to transport the items to be auctioned from the Lewenstein Collection as well. The Painting was the only work from the Lewenstein Collection that was in the possession of the Stedelijk, and therefore it had to be collected separately.

34. One of the individuals who was conducting business with Miedl after he had taken over the Goudstikker dealership and searching for other collections to sell on behalf of the Nazis was an art dealer/art restorer named Abraham Querido ("Querido"). Querido had no connection with Wilhelmine or RGL.

35. On September 5, 1940, Querido sent someone to the Stedelijk to take possession of the Painting. That individual presented a business card of Querido to the museum depot manager, Willem de Vries, which contained a note from Querido to give the Painting to the bearer.

36. Neither RGL nor Wilhelmine authorized Querido (or anyone else) to pick up the Painting or to sell it, and neither authorized anyone at the Stedelijk to release the Painting to anyone. There is no record that Querido had any authorization from RGL or Wilhelmine to pick up the Painting.

37. On October 8 and 9, 1940, an auction was held at the Muller auction house in Amsterdam. The bulk of the 277 auction lots consisted of the two looted collections: the Goudstikker Collection and the Lewenstein Collection. Lots 1 to 150 were works of art looted from the Goudstikker Collection. Lots 151 to 194 were works of art from various other collections. Lots 195 to 277 were the works of art looted from the Lewenstein Collection. The Painting was lot no. 204. The first part of the Lewenstein Collection mentioned in the catalogue,

lot nos. 195-224, was organized in alphabetical order and included the two Kandinsky paintings. The inclusion of the Painting in this catalogue in the middle of the Lewenstein lots, in alphabetical order and in sequence with the other Kandinsky painting, evidences that the seizure and sale of the Painting was part of an overall plan for the seizure and sale of the Lewenstein Collection.

38. The Painting was purportedly sold at the auction for 250 Dutch Guilders, a price representing only 10-20% of its then market value. Most of the other paintings sold at the auction were also sold for a fraction of their value. It is well established that sale of works of art owned by Jews in Nazi occupied countries at deeply discounted prices is evidence that those works of art were looted by the Nazis.

39. There is no record from the auction as to whom the Painting was purportedly sold and no receipts of payment or for the Painting.

40. The mere fact that the Lewenstein Collection was openly sold at a highly publicized auction at a major auction house known to have collaborated with the Nazis is, by itself, evidence that the Lewenstein Collection was sold as part of the Nazi plan of genocide for the Jews. No Jews at that time would have called attention to themselves or their ownership of a substantial art collection by putting it up for sale at a public auction house, much less at a sale together with the vaunted Goudstikker Collection. If Jewish owners wanted to sell a painting, they did so secretly. Otherwise it would be unlikely that they could have kept or accessed any money from the sale. Even worse, they would be risking their lives and the lives of their families, as well as the loss of all their possessions by such exposure.

41. Moreover, neither RGL nor Wilhelmine were in the Netherlands at the time of or around the auction and it would have been virtually impossible to transmit funds to them outside

of the Netherlands during the Nazi occupation. On May 24, 1940, days after the Nazi occupation had begun, the government of the Netherlands in exile in London passed a Royal Decree freezing the accounts of Dutch citizens and residents in foreign jurisdictions. This Decree would have prevented both RGL and Wilhelmine from obtaining any funds from the Netherlands while they were out of the country.

42. No one from the Lewenstein family ever received any proceeds from the sale.

43. By reason of the foregoing, the Painting at issue in this case was taken within the context of the Nazis' campaign of genocide against the Jews in the Netherlands, and therefore was taken in violation of international law.

44. RGL and Wilhelmine, who both left the Netherlands prior to the Nazi occupation and stayed away during the war, survived. They were wise not to have returned. Other family members who stayed in the Netherlands were murdered by the Nazis, as were many employees and managers of their sewing machine company, which was also seized by the Nazis. Two aunts, Rosa Lewenstein and Julie Lewenstein, both died in Auschwitz on May 31, 1944, and one uncle, Siegfried Lewenstein, died in the concentration camp located in Sobibor, Poland on May 14, 1943.

*The Family's Search for the Painting After the War*

45. On May 31, 1948, Betty Lewenstein ("Betty"), sister to Emanuel and aunt to RGL and Wilhelmine, sent a letter to the Stedelijk inquiring as to the fate of the Painting, which she stated belonged to the Lewenstein heirs (RGL and Wilhelmine). In that letter, she indicates that Wilhelmine had previously contacted the Stedelijk to find out what had happened to the Painting and that the information the Stedelijk had given Wilhelmine was completely implausible. Accordingly, Betty asked that the Stedelijk provide her with the information.

46. On June 2, 1948, Hans Jaffé, acting director of the Stedelijk, replied to Betty by letter, stating that at the request of the owner "Mrs. Lewenstein-Weyermann," it consigned the painting on September 5, 1940 to Querido.

47. This was not possible as Mrs. Lewenstein-Weyermann (Hedwig) had died in 1937.

48. Moreover, as Betty's letter indicated, the family was looking for the Painting, something they would not have been doing if they had authorized its sale.

49. In addition, the Painting appears on an inventory list of the Stedelijk dated December 4, 1940, two months after the purported sale of the Painting at the Muller auction. That inventory lists the Painting as on loan to the Stedelijk by "Mrs. Lewenstein" and located in the museum's depot. None of this information was revealed to Betty in response to her letter.

50. In addition, the records of the Stedelijk contain correspondence from May 1947 in which the museum director, Willem Sandberg ("Sandberg"), had responded to an inquiry made by Cesar Domela of Paris about certain Kandinskys, including the Painting. Sandberg stated that he had made inquiries regarding the various paintings and reported that the Painting "which was formerly owned by Lewenstein-Wegeman [sic], is now in the possession of S.B.S. Slijper, Doprstraat 14, Blaricum." The Stedelijk did not convey this information, which it had obtained at the request of someone unrelated to the family just one year earlier, to Betty.

51. RGL told RCL and Francesca that he too had searched for the collection after the war, but was unable to locate it.

*Subsequent Possessors of the Painting*

52. Recent research through the internet and archival records has revealed various details as to what happened to the Painting in and after October 1940. After the December 1940

notation indicating that the Painting was at the Stedelijk, the next time the Painting is mentioned is in a letter from Dutch art collector Salomon B. Slijper ("Slijper"), dated January 11, 1946, to a Dutch artist Gerard Hordijk ("Hordijk"), who was living in New York at that time. Slijper asked Hordijk to contact American museums in the hope of selling the Painting. In that letter, Slijper stated that he knew that the Painting had once belonged to "Mr. Lewenstein" and that it had been loaned to the Stedelijk. Unable to sell the Painting, Slijper loaned it to the Stedelijk from 1957 and 1963 and to the Gemeentemuseum in The Hague between 1963 and 1971.

53. According to an interview with Dutch art dealer Carel Van Pampus Jr. ("Van Pampus"), Van Pampus claimed that he had purchased the Painting at the October 1940 auction. Van Pampus was related to Slijper's wife. Additional sources indicate that Van Pampus had acquired the Painting on behalf of Slijper.

54. Slijper died in August 1971 and left the Painting to his widow, Johanna Hamdorff Slijper ("Johanna Slijper").

*The Sale to BLB*

55. BLB has claimed that in or about 1972 it purchased the Painting from Johanna Slijper for 900,000 Dutch Guilders. The sale and negotiation was managed by the Lenbachhaus on behalf of BLB and by Van Pampus on behalf of Johanna Slijper.

56. BLB has further claimed that it purchased the Painting at the request of the City of Munich and upon its purchase the Painting was forwarded directly to the Lenbachhaus.

57. On or about December 14, 1973, BLB officially presented the Painting to the Lenbachhaus, as a permanent loan by BLB to the museum.

*<u>BLB Knew or Should Have Known that the Painting Had Been Looted</u>*

58. BLB knew or should have known that the Painting had been looted from its rightful owners during the Nazi occupation of the Netherlands.

59. The acquisition of the Painting was handled by the Lenbachhaus, which had the expertise to investigate the provenance of the Painting and to determine whether the Painting was or was likely to have been looted by the Nazis. Moreover, Van Pampus, the same person who claimed to have purchased the Painting in 1940 was also handling the sale on behalf of Johanna Slijper. He certainly knew at that time that the Painting came from a Jewish collection, something he publically acknowledged some years later. This fact alone, readily ascertainable at the time of the transaction by simply questioning Van Pampus, would have put a buyer on notice that the Painting was or likely was stolen.

60. BLB unlawfully obtained the Painting by purporting to "purchase" it from an individual whom it knew or should have known had no right to convey ownership.

*BLB Has Failed to Abide by International Commitments*
*<u>and Obligations to Investigate and Restitute Nazi-Looted Art</u>*

61. In 1998, forty-four governments, including Germany, met in Washington D.C. and endorsed a set of non-binding principles, called "the Washington Principles," for dealing with Nazi-looted art with the goal of returning assets confiscated by the Nazis to their rightful owners or otherwise achieving a just and fair solution. The first principle states that: "Art that had been confiscated by the Nazis and not subsequently restituted should be identified." The principles go on to describe that records should be opened and resources devoted to this task and that every effort should be made to publicize the discovery of any art found to have been confiscated but not restituted. They then provide:

> If the pre-War owners of art that is found to have been confiscated by the Nazis and not subsequently restituted, or their heirs, can be identified, steps should be taken expeditiously to achieve a just and fair solution, recognizing this may vary according to the facts and circumstances surrounding a specific case.

62. In June 2009, forty-six governments, including Germany, convened in Prague to reaffirm and strengthen the goals underlying the Washington Principles, and urge that all parties, including private and public institutions and individuals, also apply them. This conference resulted in the Terezin Declaration, which provides with respect to Nazi-looted art:

> [W]e stress the importance for all stakeholders to continue and support intensified systematic provenance research, with due regard to legislation, in both public and private archives, and where relevant to make the results of this research, including ongoing updates, available via the internet, with due regard to privacy rules and regulations. Where it has not already been done, we also recommend the establishment of mechanisms to assist claimants and others in their efforts.

It then again urged all stakeholders to:

> facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all the relevant documents submitted by all parties. Governments should consider all relevant issues when applying various legal provisions that may impede the restitution of art and cultural property, in order to achieve just and fair solutions, as well as alternative dispute resolution, where appropriate under law.

63. Once these commitments were adopted, BLB and/or the Lenbachhaus, at a minimum, should have examined the Painting to determine if it was a confiscated item. Had they done so, there were numerous indicators readily discernable that should have resulted in further investigation. Among other things, the provenance in the 1992 Kandinsky watercolour catalogue raisonné showed that the Painting had been owned by Mrs. Lewenstein-Weyermann in the Netherlands, a person with a Jewish name, before it came in possession of Slijper.

64. In fact, the Lenbachhaus did publish results of provenance research on the artworks which the museum had acquired between 1933 and 1945 to verify whether they possessed looted art. The Painting was not included.

*Plaintiffs' Rights to the Painting*

65. Prior to its despoilment, RGL and Wilhelmine owned all rights to the Painting and Irma had a community property interest in RGL's share.

66. Plaintiffs, as the sole heirs of RGL, Wilhelmine and Irma, inherited all rights and interests in the Painting.

67. Plaintiffs own all right, title and interest in the Painting.

68. For the reasons stated in this Complaint, the Painting was taken from its legitimate owners in 1940 in violation of international law during the period of the Nazi occupation in the Netherlands in furtherance of the Nazi campaign of Jewish genocide.

69. Defendant knew or should have known that the Painting was a looted artwork and did not purchase the Painting in good faith.

70. Defendant's purchase of the Painting in 1972 under the circumstances set forth herein also constituted and/or ratified the taking of the Painting.

*Plaintiffs' Discovery and Demand for the Return of the Painting*

71. In or about September 2012, RCL became aware that the Lenbachhaus had possession of the Painting and that BLB claimed to "own" it. Francesca learned this in June 2013. Elsa learned this in May 2015.

72. By letter dated November 5, 2015, Plaintiffs made a demand to BLB for the return and restitution of the Painting.

73. In connection with that demand, Plaintiffs presented evidence to BLB as to their ownership rights to the Painting and that the Painting had been taken in the context of the Nazi occupation of the Netherlands in violation of international law and confiscated within the meaning of the Washington Principles and the Terezin Declaration.

74. BLB has failed and refused to return or restitute the Painting to Plaintiffs.

75. BLB's failure to return or restitute the Painting to Plaintiffs violates the Washington Principles and the Terezin Declaration.

76. BLB's failure to return or restitute the Painting to Plaintiffs constitutes a taking of the Painting.

77. Upon information and belief, the Painting has an estimated value of $80,000,000.

## FIRST CLAIM
## (Replevin)

78. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79. Plaintiffs are the rightful owners and are thus entitled to recover sole possession of the Painting.

80. The Painting is a unique and irreplaceable work of art.

81. Plaintiffs have demanded the return of the Painting which demand has been refused by Defendant.

82. As a result, Plaintiffs are entitled to the return of the Painting, or alternatively, compensation for its loss from Defendant.

**SECOND CLAIM**
**(Conversion)**

83. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84. Plaintiffs are the rightful owners and are thus entitled to recover sole possession of the Painting.

85. Defendant converted and appropriated the Painting to its own use in complete disregard and derogation of Plaintiffs' right, title and interest to the Painting.

86. As a result of Defendant's wrongful conduct, Plaintiffs have suffered damages in an amount to be determined at trial, but in excess of $80,000,000.

**THIRD CLAIM**
**(Taking and Detention)**

87. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88. Plaintiffs are the rightful owners and are entitled to the use and benefit of the Painting from the time of the taking through the pendency of this action.

89. As a direct result of Defendant's wrongful taking and detention of the Painting, Plaintiffs have been deprived of their rights to the use and benefit of the Painting.

90. Defendant converted and appropriated the Painting to its own use and benefit in complete disregard and derogation of Plaintiffs' right, title and interest to the Painting.

91. As a result of Defendant's wrongful conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

**FOURTH CLAIM**
**(For Declaratory Relief)**

92. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93. An actual case or controversy has arisen between Plaintiffs and Defendant as to the ownership of the Painting.

94. The Painting was unlawfully looted through and as a result of the Nazi occupation of the Netherlands and never returned to its rightful owners.

95. Defendant does not have good title or any rights to the Painting.

96. Plaintiffs are the rightful owners and have demanded the return of the Painting.

97. Defendant has unlawfully refused to return the Painting.

98. Plaintiffs are entitled to a judgment declaring that they are the rightful owners of the Painting and that Defendant has no right, title or interest in it.

**FIFTH CLAIM**
**(Unjust Enrichment)**

99. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100. Defendant has wrongfully possessed, used and benefited from the Painting since 1972.

101. Defendant has been enriched by its misappropriation of Plaintiffs' ownership rights to the Painting and by any proceeds received therefrom or compensation related thereto.

102. Defendant has used the Painting in commerce in the US, in New York and outside of the US with a significant effect in the US and has benefited and profited from that use.

103. Defendant's enrichment is at Plaintiffs' expense in that Plaintiffs were and continue to be the sole rightful heirs and owners of the Painting.

104. The circumstances are such that equity and good conscience require Defendant to make restitution to Plaintiffs.

105. As result of Defendant's wrongful conduct, Plaintiffs are entitled to restitution of the Painting or compensation for their interest and/or damages in an amount to be determined at trial, but not less than $80,000,000.

**SIXTH CLAIM**
**(Constructive Trust)**

106. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 105 of this Complaint as if fully set forth herein.

107. Defendant has wrongfully possessed, used and benefited from the Painting since 1972 and is continuing to do so despite Plaintiffs' demand for its return.

108. As a result, Plaintiffs are entitled to the imposition of a constructive trust on the Painting, obligating Defendant to return the Painting or compensate Plaintiffs for their interest in the Painting, which interest is valued in an amount to be determined at trial, but not less than $80,000,000.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray for judgment against Defendant as follows:

(a) Entry of judgment on all claims in favor of Plaintiffs;

(b) Judgment declaring Plaintiffs to be the sole owners of the Painting entitled to all rights, title and interest thereto;

(c) An order directing Defendant to return the Painting to Plaintiffs;

(d) Imposition of a constructive trust upon the Painting;

(e) Restitution of the Painting to Plaintiffs or its equivalence in value;

(f) Damages for the appropriation of the Painting and for taking and detaining it in an amount to be determined at trial, which is in excess of $80,000,000;

(g) Pre- and post-judgment interest, to the fullest extent assessable at law or in equity on all damages;

(h) Reasonable attorneys' fees, costs and expenses;

(i) Such other further relief as the Court may deem just and proper.

Dated: New York, NY
March 3, 2017

KRAUSS PLLC

By: /s/ Geri S. Krauss
Geri S. Krauss
41 Madison Avenue, Suite 4102
New York, New York 100101
Phone: (914) 949-9100
Facsimile: (914) 949-9109
gsk@kraussny.com
*Attorneys for Plaintiffs*